## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ALFREDA D. MILLET
9803 Angora Drive
Cheltenham, Maryland
(301) 466-3926 – Cell
(301) 782-7725 - Home

    *Plaintiff,*

    v.

STEVEN T. MNUCHIN, IN HIS OFFICIAL
CAPACITY AS THE SECRETARY OF THE
DEPARTMENT OF THE TREASURY,
INTERNAL REVENUE SERVICE,
1500 Pennsylvania Ave
Washington, DC 20220

    *and,*

WILLIAM H. MAGLIN
77 K Street, NE
Washington, DC

GINA JONES
77 K Street, NE
Washington, DC

KYLE LOCKLEY
77 Street, NE
Washington, DC

    *Defendants.*

Case: 1:19–cv–01869 (JURY DEMAND)
Assigned To : Sullivan, Emmet G.
Assign. Date : 6/25/2019
Description: Pro Se Gen (F–DECK)

### COMPLAINT FOR VIOLATIONS OF:

    **(1) TITLE VII OF THE CIVIL RIGHTS
    ACT OF 1964;**

**[JURY TRIAL DEMANDED]**

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
(Non-Prisoner Complaint)

This is a lawsuit to remedy the practice of racial discrimination, harassment (including

1

disparate treatment), retaliation, and related abuses at the Department of the Treasury, Internal Revenue Service (IRS). Plaintiff is an exemplary and accomplished Black IRS employee who has been the subject of race-based discrimination, who has been harassed, including disparate treatment, and who have been retaliated against for opposing discrimination and for participating in the EEO process. Plaintiff has worked in positions of public trust and the Federal Government including for other departments within the IRS. She has dedicated more than 37 years of her federal employment career to carrying out the mission of the IRS. Plaintiff is a strong performer who rose through the ranks at the Agency due to her hard work and stellar performance exhibited over several decades. In her first 30 years of service, Plaintiff worked in IRS Taxpayer Service Division, in its Examinations Division, and in its Tax Exempt and Governmental Entities Division. She enjoyed all her experiences and the chance to build productive relationships with her coworkers. However, shortly after Plaintiff joined the Chief Financial Officer organization in October 2007, it all changed. Plaintiff believes she has been targeted by management and ostracized by most of her coworkers as they have kept their distance from her since May 2013, which was when she first filed a formal EEO complaint alleging racial discrimination. Plaintiff does not acquiesce to racial discrimination; she opposes it and in so doing, regularly suffers harassment and retaliation mainly by White male and female supervisors and other White employees who management has drawn into their web of harassing Plaintiff.  Plaintiff has been passed over for promotions, received undeserved performance appraisals, the terms and conditions of her employment has been altered, she's been threatened with disciplinary action, she's received excessive work assignments outside her position description, including undesirable assignments, and she has not received credit for many of her completed work assignments since May 2013. Plaintiff is brave enough to stand up to the humiliation, abuse, and

face a hostile, confusing, and futile complaint process that thwarts her efforts to secure relief at every turn.

## NATURE OF THE ACTION

Plaintiff alleges that Defendants William H. Maglin, Gina Jones, and Kyle Lockley, unlawfully discriminated against her on the basis of her race. Plaintiff further alleges that they harassed her, retaliated against her, and created a hostile work environment for her because she opposed discrimination in the workplace.

As a responsible employee, Plaintiff has followed all appropriate channels to convey the feelings of anxiety and discomfort that this exposure causes for her and to encourage her IRS leadership to take some steps to ameliorate this hostile work environment for her. But IRS leadership, including its Treasury Inspection General for Tax Administration (TIGTA), feigned an inability to take any steps, even disciplining management for its role for harassing and retaliating against Plaintiff.

With nowhere else to turn, Plaintiff file this action pursuant to the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq* for injuries suffered due to a long-standing and pervasive practice of race discrimination, harassment (including disparate treatment), retaliation, and the creation of a hostile work environment. These violations are systemic in nature constituting a custom or policy of discrimination, harassment and retaliation that has occurred for years and continues to the present day. Not only have Plaintiff's concerns and efforts been brushed aside by her colleagues, superiors, and by the IRS for more than seven years, leadership has retaliated against her after her complaints-despite years of exemplary performance and consistent positive reviews. It has also derailed her established career path by including false information in her employment files. This lawsuit seeks to ensure that Plaintiff can perform her duties with dignity,

free from fear and humiliation and in a stress-free environment, by achieving what other Black employees and lawsuits have thus far been unable to achieve, the end of discrimination at the Department of the Treasury, at the IRS.

Plaintiffs seek injunctive and declaratory relief, compensatory damages and reasonable attorneys' fees and costs as remedies for Defendants' violations of her rights.

## I.   THE PARTIES TO THIS COMPLAINT

### A.   The Plaintiff

1.   Plaintiff Alfreda D. Millet is a Black Female. Has been employed with the IRS since January 26, 1982. Plaintiff works for the Chief Financial Officer (CFO); Financial Management Policy (FMP) office since October 2007 as a GS-14, Financial Management Analyst. Her program area was Accounting Policy where her primary responsibility was policy writing until May 2018. Because of the May 2018 FM realignment, Plaintiff's duties were revised, and she is no longer responsible for policy writing.

The FMP office is responsible for establishing accounting and travel policy and procedures; develops and implements financial management projects; and identifies and coordinates the delivery of general, technical, finance, and financial system training. The Office of FMP is divided into two teams, Accounting Policy and Travel and Relocation.

### B.   The Defendants

2.   Steven T Mnuchin, Secretary of the Department of the Treasury, Internal Revenue Service, has been designated to receive such complaint on behalf of the Department of the Treasury. The Department of the Treasury is an executive department. Plaintiff is bringing this complaint against Secretary Mnuchin in his official capacity. The federal government employs more than two million employees. The federal government is liable for the acts of their agents and

employees as set forth below.

2. Defendant William H. Maglin ("Defendant Maglin" – White Male) is the Associate Chief Financial Officer for Financial Management. He is a former United States Colonel of the Armed Forces. He is also Plaintiff's second-level supervisor. Defendant Maglin became an employee of the Department of the Treasury, IRS, in or about 2004. Defendant Maglin serves as part of IRS executive management with responsibilities that include having oversight of the Custodial and Administrative Financial Management functions; delivering sound financial management through proper accounting and timely reporting of appropriated funds and custodial activities. Defendant Maglin has more than 50 contractors and 250 IRS employees working under his leadership. Defendant Maglin had the authority to approve Plaintiff's annual commitments and work assignments; approve her performance ratings; and he had the authority to take, direct others to take, recommend, or approve Plaintiff's personnel action. As of May 2018, Defendant Maglin became Plaintiff's third-level supervisor. Defendant Maglin worked in Washington, DC and all of the events alleged herein occurred in Washington DC. Defendant Maglin personally participated in many of the acts alleged in this complaint. Plaintiff is bringing this complaint against Defendant Maglin in his official capacity.

3. Defendant Gina Jones ("Defendant Jones" – White Female), was Plaintiff's first-level supervisor from September 2012 until May 2018. She oversaw the Policy Office. Defendant Jones personally participated in many of the acts complained of in this litigation. Defendant Jones serves as part of IRS senior management with responsibilities that include managing personnel, assignments, discipline, and having oversight of the Financial Management Policy (FMP) Office. The FMP Office is responsible for establishing accounting and travel policy and procedures; developing and implementing financial management projects; and identifying and

coordinating the delivery of general, technical, finance, and financial system training. The FMP Office is divided into two teams, Accounting Policy and Travel and Relocation. Defendant Jones had nine employees that she manages. Defendant Jones had the authority to approve Plaintiff's annual commitments and work assignments; approve her performance ratings; and she had the authority to take, direct others to take, recommend, or approve Plaintiff's personnel actions. As of September 2012, Defendant Jones became Plaintiff's first-level supervisor. Defendant Jones worked in Washington, DC and all of the events alleged herein occurred in Washington, DC. Defendant Jones personally participated in many of the acts alleged in this complaint. Plaintiff is bringing this complaint against Defendant Jones in her official capacity.

4.    Defendant Kyle Lockley ("Defendant Lockley" – Black Male), was Plaintiff's detailed-in supervisor from May 15 – November 14, 2017. He oversaw the Internal Control's Office. The internal Control office "evaluates the effectiveness of internal controls through studies and program assessments, leads education and outreach efforts related to control activities, and coordinates development of significant year-end reporting materials related to the Financial Statement Audits." Defendant Lockley personally participated in a some of the acts complained of in this litigation. Defendant Lockley had the authority to assign Plaintiff work assignments during her detail into his office, the authority to approve her leave, and the authority to approve personnel actions; and the authority to issue Plaintiff a "Departure Rating" at the end of her detail assignment. Defendant Lockley worked in Washington, DC and all of the events alleged herein occurred in Washington, DC. Defendant Lockley personally participated in several of the acts alleged in this complaint. Plaintiff is bringing this complaint against Defendant Lockley in his official capacity.

## II. BASIS FOR JURISDICTION

5.   The unlawful employment practices alleged in this complaint occurred in the District of Columbia.

6.   This Court has subject-matter jurisdiction over this matter pursuant to 42 U.S.C. 2000e-5(f) and 2000e-16(c). This court has jurisdiction to grant a declaratory judgment which is conferred by 28 U.S.C. §§ 2201-02.

### III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.   Ms. Millet timely filed an informal complaint on December 12, 2016, and a formal complaint on March 21, 2017. Ms. Millet also timely filed another informal complaint, which is a part of this complaint, on December 19, 2017, and a formal complaint on March 13, 2018. Both complaints were filed with the Office of Diversity and Inclusion for investigation which normally handles discrimination complaints against the agency.

8.   The Agency issued its Report of Investigations (ROI) for the 2017 EEO Complaint on November 9, 2017, and its ROI for 2018 Complaint on August 23, 2018. After Ms. Millet filed both Complaints and after EEOC had assigned the 2017 Complaint, Plaintiff requested, through her then Counsel, that both Complaints be combined and so they were in late 2018. Ms. Millet requested a Final Agency Decision (FAD) from IRS on January 29, 2019, and so it was issued on March 26, 2019, and received by Ms. Millet, via email, by Agency Counsel on March 27, 2019.

9.   More than 180 days since the filing of Ms. Millet's Complaint have passed, and no appeal has been filed.

10.   Ms. Millet have timely filed this action and have complied with all administrative prerequisites to bring this lawsuit. Ms. Millet has also filed other related cases with the Courts under Case: 1:19-cv-01244 (JURY DEMAND) on April 29, 2019.

### IV. STATEMENT OF CLAIMS

7

11.   At all times material to this action, Plaintiff was employed by the Department of the Treasury, at the IRS, in the CFO's office as a Financial Management Analyst in the same office location as Defendants Maglin, Jones and Lockley.

12.   Plaintiff was initially hired to lead the Financial Management Policy (FMP) office accounting and travel teams in the efforts to package policies in Internal Revenue Manuals (IRMs), Delegation Orders (DO) Standard Operating Procedures (SOP) and other Internal Management Documents (IMDs).

13.   However, in March 2010, Plaintiff was demoted (with no financial harm done-issue is currently with the Court) and became primarily responsible for packaging IMDs.

14.   On October 20, 2016 at 8:03 a.m. Plaintiff sent Defendant Jones an email requesting sick leave from 12:30 to 4:30 p.m. Defendant Jones was non-responsive and seemingly untruthful about her whereabouts. At 1:30 p.m. Plaintiff still had not heard from her, so she contacted her co-worker, Ms. Angela Cook, ("Ms. Cook" - Black Female), who routinely acts on Defendant Jones' behalf whenever she is out of the office, to see if she was in the office.

15.   Ms. Cook told Plaintiff that Defendant Jones came into the office around 9:15 a.m. and left the office around 11:30 a.m. to go to the dentist and that she was still out of the office. A t 4:23 p.m., right after she returned to the office according to Ms. Cook, Defendant Jones responded to Plaintiff's email request stating she had been in meetings all day, which is why she had not responded to her request for sick leave. The leave was approved even though Plaintiff had already taken the leave.

16.   Plaintiff did not believe Defendant Jones explanation since she had a habit of manipulating the truth. She believed Defendant Jones ignored her request for sick leave on purpose as she has done in the past.

17.    On November 2, 2016, Defendant Jones informed Plaintiff that the Interim

Guidance she had assigned her to draft and complete on October 4, 2016, would not be

issued even though the assignment had been completed and approved by Defendant

Maglin. She also told Ms. Millet that Defendant Maglin changed his and that he wanted

the information contained in the Interim Guidance to be put in the Debt Management

IRM Plaintiff was drafting at the time.

18.    Defendant Jones first assigned the Interim Guidance assignment, which was outside

her assigned commitments, on January 21, 2015, with a February 15, 2015, submission due

date. Plaintiff submitted her first draft on February 24, 2015, due to some back and forth

issues with management about what should be included in the Interim Guidance, and

management delayed reviews. However, even though four months later, a final draft was

approved by Defendant Maglin on June 24, 2015, he again decided a second time that the

Interim Guidance would not be issued with an explanation that he wanted the information in

the Debt Collection IRM that Plaintiff was still drafting at the time.

19.    On November 9, 2016, Defendant Jones sent Plaintiff an email letting her know she

had changed her approved November 1, 2016, sick leave request for the entire day (nine

hours), from seven hours to nine hours because the meeting to present a presentation on debt

collection to Alan Dubois, Deputy CFO (DCFO) had been canceled. Plaintiff reminded

Defendant Jones in her November 9, 2016, response email about the 10 emails she copied

her on November 1 from 7:30 a.m. to 930 a.m. Plaintiff also stated in her response that she

did not plan to work at all but then she remembered she had to move some work. Nonetheless,

Plaintiff apologized to Defendant Jones for the oversight.  Plaintiff believed if she did not keep

up with her assignments, she would suffer the consequences, i.e., she could be written up, her

9

appraisals could be affected, she could be disciplined and possibly be removed from service especially since she had been progressively disciplined based on fraudulent charges that were never proven nor investigated which began soon after she filed her first informal complaint on March 22, 2013. Although Plaintiff was sick, she was not sick to the point that she could not do any work, but she did not feel well enough to travel to the office and work there all day.

20.    On November 10, 2016, Defendant Jones responded to Plaintiff's email stating she would not increase her sick leave to nine hours with a caveat that in the future, she obtains her approval before working on an approved sick day.

21.    Plaintiff believes there is no known process/procedures or policy in place requiring an employee to ask permission before working part of the day when calling in sick. Plaintiff believe Defendant Jones made up the requirement that she get her approval to impede her from meeting her work assignment due dates and she has done since her first EEO filing in 2013.

22.    Plaintiff has never heard of a White employee being subjected to the requirement to request permission to work after leave was approved.

23.    On November 16, 2016, Ms. Cook called Plaintiff's home around 8 p.m., after Plaintiff tried contacting her a half hour earlier to inform her that she agreed with her that all her accepted comments had not been included in the Debt IRM that Defendant Jones tasked her to review.

24.    Plaintiff told Ms. Cook that she had realized she had not included all her accepted comments in the Debt IRM but that she would include them and send her a copy of the IRM with the comments in them. Plaintiff noticed Ms. Cook was very agitated, hostile, abrasive and loud towards her. She also kept repeating that she was upset with Plaintiff. However, when Plaintiff asked her why she was so upset, she responded "I'm pissed because you copied Gina and Bill

(Defendant Maglin) on an email you sent me about the Debt IRM and you weren't supposed to do that." When Plaintiff asked why, she responded, "the feedback I gave you on your Debt IRM was supposed to be between me and you" and "I am trying to help you-I am trying to protect you." Plaintiff responded that she did not need protection which was when Ms. Cook responded, "Gina and Bill are trying to find something to pin on you so that they can fire you!"

25.    Plaintiff did not ask Ms. Cook, nor did she tell Plaintiff why she believed Defendant Jones and Maglin was trying to find something on her to fire her. Because Plaintiff was in shock, bewildered and appalled, but not surprised, Plaintiff closed the conversation and terminated the call.

26.    Ms. Cook had been maintaining that Defendants Jones and Maglin were mistreating Plaintiff for years. One night in or around January 2017 Ms. Cook called Plaintiff's home and left a message on her phone when she did not answer, that she did not like the way "they" (Defendant Jones and Maglin) were treating her.

27.    Plaintiff and Ms. Cook sometimes socialized and attended events outside of work. Sometimes they, along with their spouses, would sometime attend dance class after work some nights. They had each other's personal contact information and Plaintiff had visited Ms. Cook at her home several times before the incident happened. Sometimes Plaintiff and Ms. Cook would discuss personal matters and sometimes they would briefly discuss Defendant Jones harassment and unfair treatment of Plaintiff.

28.    Defendant Jones relied heavily on Ms. Cook's knowledge and expertise especially since Ms. Cook was once the FMP group manager before Defendant Jones and Plaintiff began working in the FMP office. Defendant Jones and Ms. Cook work very closely together, including

11

attending meetings with her by her side, as Defendant Jones depended a great deal on her from the time she was hired in September 2012 until the office realignment in May 2018.

29.   On November 17, 2016, Plaintiff met with Defendants Jones and Maglin to discuss with them the conversation she had with Ms. Cook about them trying to pin something on her, so they could fire her.

30.   Defendant Maglin responded he was not trying to fire Plaintiff "at that time" but Defendant Jones offered no response. Plaintiff documented the conversation.

31.   Plaintiff believed what Ms. Cook told her because she had been progressively disciplined by both Defendants Jones and Maglin as evident when she received a counseling letter in April 2013; followed by an admonishment letter and a one-day (two-days was proposed but due to an administrative error, Plaintiff was suspended for one-day) suspension in 2014; followed by a 14-day suspension in October 2015 even though Plaintiff never broke any federal laws or violated any IRS policies, rules, or regulations. None of the disciplinary actions were warranted nor were they investigated. Defendant Jones made up fraudulent claims, Defendant Maglin proposed disciplinary actions and was the hearing and deciding officials on the one-day and 14-day suspensions without pay and benefits. He was also the deciding official for the admonishment, and the two suspensions. Defendant Maglin also violated Ms. Millet's due process rights when he did not allow her the right to present her oral reply to the deciding official (he and his second-level manager, Gregory Kane).

32.   Plaintiff was sure Defendants Jones and Maglin would do whatever they could to get rid of her especially since she named them both in all six of her EEO filings beginning in March 2013.

The Complainant stated she was harmed by this action because she was upset and stressed, she experienced brain spasms, could not sleep peacefully, her blood pressure was elevated, her concentration was off, and she experienced anxiety attacks. She testified she believes this action was based on her race because she has never heard of a White employee having been treated similarly.

33.   On November 23, 2016, Defendant Jones required Plaintiff to modify a Delegation Order (DO) Matrix assignment she had prepared and submitted to her months earlier with very little guidance from her, even though her co-worker, Walt MacDermid ("Mr. MacDermid" – White Male), had completed the assignment two years earlier. She also wanted Plaintiff to present the spreadsheet to Defendant Maglin one-on-one, even though presenting the spreadsheet to Defendant Maglin was what he delegated Defendant Jones to do and even though the presentation inured only to his benefit, not the IRS.

34.   Plaintiff believes Defendants Jones and Maglin were the management officials responsible for this action.

35.   Plaintiff successfully completed the assignment and submitted it timely.

36.   Plaintiff questioned Defendants Jones and Maglin regarding the need to do the one-on-one presentation with Defendant Maglin and communicated that she was uncomfortable with presenting the task given the situation with the allege discrimination, harassment, retaliation and her being in a hostile environment. Defendant Maglin told her he knew she would be uncomfortable with the task, but he still wanted her to do the presentation.

37.   Defendants Jones and Maglin wanted Plaintiff to continue to populate the spreadsheet with the names of each DO, the date each DO was published, a brief

description of each DO, the authority for each delegation order, provide the revision dates while coordinating her efforts with each employee in her office as they were assigned specific DOs to complete and publish.

38.    Plaintiff presented the completed DO spreadsheet assignment, one-on-one, to Defendant Maglin by the established due date.

39.    Even though Plaintiff believed making the one-on-one presentation to Defendant Maglin was unfair and unnecessary as it had nothing to do with carrying out the mission of the organization. Plaintiff believe she was set-up to be humiliated and tortured.

40.    On November 29, 2016, Defendant Jones approached Plaintiff at her desk to summons her to her office. When Plaintiff arrived Defendant Jones told her that she and Defendant Maglin decided she was no longer to work after hours unless she seeks approval first. Defendant Jones also told her she was not to contact any of her co-workers after working hours to discuss work without her prior approval. This requirement came ten days later, after Plaintiff reported the November 16, 2017, incident with Ms. Cook, and after Defendants Joan and Maglin both had the opportunity to discuss the incident with Ms. Cook.

41.    Defendant Maglin, through Defendant Jones, decided that Plaintiff needed approval to discuss work-related matters with any of her co-workers, after working hours.

42.    Fifteen minutes after their meeting ended, Defendant Jones sent Plaintiff an email addressing the after working hours notification requirement. She also attached two additional emails that she sent Plaintiff on September 18, 2013, that also addressed Plaintiff working afterhours to which Plaintiff responded later that day that she was overworked and did what was necessary to stay current with her work assignments.

43.     Plaintiff never asked for compensatory time or overtime because she was sure it would not be approved. Plaintiff, in her September 18, 2013, response to Defendant Jones' September 18 email requested that she and Defendant Maglin lighten her work load but that never happened. Plaintiff was consistently assigned additional work assignments/responsibilities which she believes was an attempt to impede her for meeting her target dates.

44.     Several of Plaintiff's co-workers have worked past their TOD hours. Ms. Cook told Plaintiff she sometimes works on her days off to complete an ad hoc project filtered down from the Commissioner's office without pay, a few weeks earlier.  Plaintiff reminded Defendant Jones that she received at least 10 emails from her after her working hours in November 2016. Plaintiff also reminded Defendant Jones that she told her (Plaintiff) on November 17, 2016, she worked in the office until around 9:00 p.m. a day or two earlier and that she had done it many times prior to November 2016.

45.     Defendants Jones and Maglin had been aware Plaintiff 's after working hours had been going on since 2013 because of her large inventory of work assignments which was impossible for her to complete during her tour of duty.  Plaintiff viewed Defendant Jones' order as a threat of disciplinary action if she did contact a co-worker after working hours without first notifying her. She also believed she was told to stop working past her tour of duty in retaliation for her disclosing what Ms. Cook told her about Defendants Jones and Maglin trying to find something on Plaintiff so that they could fire her.

46.     Plaintiff was not allowed to provide input on her FY17 Commitments; When she refused to sign them without a discussion, Defendant Jones became nasty and hostile; Plaintiff was given five commitments, each of which had multiple commitments within it,

15

whereas a co-worker had only four commitments; Defendant Jones included commitments duties unrelated to her position description.

47.    Plaintiff believes Defendant Jones and Maglin are the management officials responsible for this action.

48.    Plaintiff's FY 2017 commitments were prepared by Defendant Jones and approved by Defendant Maglin.  The commitments were shared with Plaintiff on November 28, 2016, after she suggested to Defendant Jones that she and Defendant Maglin propose her FY 2017 commitments and discuss them with her including what they expected of her (which she did not do in prior years) before she would agree and/or sign them.

49.    In prior years, Plaintiff prepared her own commitments without any input from management. But each time she prepared and submitted them to Defendant Jones and Maglin to review and approve or in the alternative, work with her until they were acceptable to everyone, management would totally rewrite them even after Plaintiff prepared them in accordance with Human Capital Office' guidelines.

50.    On November 22, 2016, Defendant Jones contacted Plaintiff to inform her that she had been assigned five commitments and that they were in the HR Connect system waiting for her signature. Plaintiff told Defendant Jones that she would not sign the commitments until she and Defendant Maglin had the opportunity to discuss them with her.  Defendant Maglin was the approving official. Defendant Jones told Plaintiff that Defendant Maglin was on leave and that he could not be reached. Plaintiff did not accept Defendant Jones' explanation and thus reiterated that she needed to discuss the commitments before signing them. Defendant Jones attitude went from being pleasant to being angry as evident in her tone.

51. Defendants Jones and Maglin did discuss Plaintiff's commitments with her during a conference call that day. However, during that call Defendant Jones was very upset, agitated and hostile towards Plaintiff. Plaintiff asked her to calm down while Defendant Maglin ignored her hostility allowing her to go on until Plaintiff made a point of how Defendant Jones hostility towards her affected her.

52. Plaintiff and Defendant Jones worked together to modify the commitments until Defendant Jones and Maglin, not Plaintiff, were satisfied with them.

53. Defendants Jones and Maglin went back and forth on Plaintiff's commitments behind the scenes. Plaintiff knows this to be true because Defendant Maglin was copied on every email Defendant Jones sent her regarding the modifications.

54. Defendant Jones added more assignments to Plaintiff's commitments after she had already agreed with the modifications. Plaintiff became aware of this when she went into the HR Connect system to sign them.

55. Plaintiff refused to sign the commitments, so Defendant Jones signed them on her behalf as she had done in the past whenever Plaintiff refused to sign them especially when the assignments were not in her position description.

56. Plaintiff learned a short time later that she and all Defendant Jones Black managerial official employees was assigned five commitments while her only White Female managerial official, Reese Scott ("Ms. Scott"), had four commitments assigned to her which she confirmed in or about November 2016.

57. She told Plaintiff that she prepared her own commitments with minimal input from Defendant Jones and no input from Defendant Maglin. She also told Plaintiff that she had four commitments, not five. Plaintiff have had similar conversations with Ms. Cook about the

preparation of her commitments. She also told Plaintiff that she prepares her own commitments with little input from Defendant Jones.

58.   On or about November 21, 2016, Plaintiff received her appraisal and was displeased with the unfair performance rating of "Met." Plaintiff did not receive credit for many of her completed assignments even though she provided management with her annual self-assessment. The appraisal contained inaccurate, negative, and frivolous comments. Management refused to modify the rating after receiving Plaintiff's Rebuttal.

59.   Plaintiff believes Defendants Jones and Maglin are the management officials responsible for this action.

60.   Plaintiff does not believe she was rated fairly on the elements of her responsibilities found in Part IA of Form 12450-B nor was she rated fairly on the elements of her commitments found in Part 1B of the same form. Plaintiff believe she received the rating 's assignments are found in her FY2016 Commitments.

61.   Defendants Jones and Maglin discussed Plaintiff's responsibilities and commitments with her two months after the rating period began. For each of her five assigned commitments she had been assigned, she had Fully Successful Standards-FS Standard and E Standards that would be used to determine her rating.

62.   Plaintiff had to complete the E Standards to receive an "Exceeds" summary rating. However, Plaintiff was told that some of the E Standards were contingent upon an event happening. For example, for Commitment 1 the E Standards are as follows: (1) overcome significant obstacles in any debt collection matter that arises throughout the year; and/or (2) overcome significant obstacles in support of TIGTA audits related to policies and procedures of the IRS non-tax debt collection program.

18

However, neither of these events happened in FY2016 and, therefore, she could not exceed the commitment.

63.    Plaintiff believed Defendant Jones and Maglin made it nearly impossible for her to earn an Exceeds rating. Some of the E Standards were out of Plaintiff's control and purview. However, even though Plaintiff completed many additional assignments outside her commitments, she still received a "Met" summary rating.

64.    Plaintiff believed and was told by Defendant Jones, unless all the E Standards for each of the commitments assigned to her were completed, she would not receive and "Exceeds" summary rating. She also believed her commitments were designed for her to receive a "Met" summary rating only.

65.    Defendant Jones has consistently included co-workers on emails to Plaintiff regarding her work assignments and, she "Farms out" Plaintiff's completed work assignments for GS-13s, 14's, and 15's to review, one of whom works outside of their group even though it was Jones' responsibility and even though none of the reviewers were stakeholders nor subject matter experts.

66.    On December 1, 2016, Plaintiff was required to make a debt collection presentation to the DCFO even though she believed the requirement was unnecessary, even though the responsibility was not in alignment with her position description, and even though the presentation would inure only to the DCFO's benefit.

67.    Plaintiff believes Defendants Jones and Maglin are the management officials responsible for this action.

68.    On or about September 2016, Plaintiff received a meeting invite from Defendant Maglin's office, to brief the DCFO on the debt process on September 29, 2016, via

19

conference call which was later rescheduled to November 10, 2016, and then rescheduled to December 1, 2016. The briefing was to take place in in Defendant Maglin's side office.

69.   Defendant Jones instructed Plaintiff to work with Ms. Cook on the presentation, even though Plaintiff had already put on a debt collection presentation in or about May 2015 which she decided to use for the December 1 conference call.

70.   Plaintiff was the only employee of Defendant Jones' who attended the annual debt collection symposiums and who studied debt collection laws since 2013. To Plaintiff's knowledge and belief, Ms. Cook never attended any debt collection training classes since her employment with the CFO's office which began prior to Plaintiff being hired by the CFO's office in 2007.

71.   Plaintiff presented the debt collection briefing to the DCFO on December 1, 2016.

72.   Plaintiff received commitments in or about November 2016 containing assignments and duties that was not in her position description.

73.   Plaintiff believes Defendants Jones and Maglin are the management officials responsible for this action.

74.   Plaintiff was responsible for managing a debt collection program that was being managed and supervised by one of Defendant Maglin's managers who manages the Debt Collection Unit at the Beckley Finance Center (BFC).

75.   Plaintiff challenged Defendant Jones on this commitment for obvious reasons. As far as debt collection was concerned, Plaintiff was only responsible for revising the already published (September 23, 2013) Debt Collection IRM. She was also responsible for preparing all annual debt collection certification documents for Defendant Maglin's approval even though the work was done at the BFC.

76.   Plaintiff received a meeting invite from Defendant Jones on or about November 2016, to attend a debt collection conference call on January 24, 2017, either in person (in Defendant Maglin's office) or via conference call-in. Plaintiff chose to call into the meeting.

77.   On January 24, 2017, Plaintiff was forced to attend a conference call meeting on debt management in Defendant Maglin's side conference room, sitting directly in front of him instead of being allowed to dial in from her desk like her co-workers.

78.   On the day of the meeting, Plaintiff decided to call into the debt management meeting because she was working on another project and felt she could listen in on the call while working on her other project.

79.   As soon after Plaintiff announced her name, her co-worker Mr. MacDermid showed up at her cubicle doorway.  He told her that Defendant Maglin sent him to get her and that he wanted her in his office to listen in on the call.

80.   When Plaintiff arrived at Defendant Maglin's office, there was only one seat available and it was located directly in front of him. Reluctantly, Plaintiff took the available seat and became extremely uncomfortable and anxious. Plaintiff questioned Defendant Maglin as to why it was necessary for her to be in his office versus listening in on the call at her desk.  He responded that he preferred her being in his office.

81.   On October 24, 2017, Plaintiff met with Defendant Jones to discuss and received her FY' 2017 annual appraisal, covering the period October 1, 2016, through September 30, 2017. When she initially reviewed her appraisal, she did not notice any mentioning of the projects she completed while on her six-month detail with Defendant Lockley. When she made an issue of it, Defendant. Jones suggested that she address the issue with Defendant Lockley even after she showed her all the projects she completed while on the detail assignment.

82. On or around October 24, 2017, Plaintiff spoke with Defendant Lockley as suggested by Defendant Jones, about the reason she did not receive credit for the completed assignments in her annual appraisal. Defendant Lockley told her that she was not getting credit for the completed assignments because she handed them in three days after the close of her September 30, 2017 rating period. even though he knew the assignments were completed in FY' 2017.

83. On Tuesday, October 3, 2017, Plaintiff hand-carried the packaged completed assignments to Defendant Lockley after her three-day weekend, which included a scheduled day off.

84. Whenever Plaintiff completed assignments while assigned to the Policy Office, she was required to package them before she hand-carried them to Defendant Jones for her review. She followed this same practice during her detail assignment to the Internal Control (IC) Office, the office Defendant Lockley managed. Since September 30 fell on the weekend, Plaintiff could not submit the completed assignments.

85. Defendant Lockley never told her she would not receive credit for the work she completed at the time she handed them in to him. It was not until November 24, 2017, that he told her she would not receive credit for her completed assignments, which was 21 days after she submitted the assignments. He told her that she would receive credit for the completed assignments in her FY' 2018 annual appraisal which did not happen either.

86. Defendant Jones later shared with Plaintiff that it was Defendant Lockley who convinced her not to give Plaintiff credit for her completed assignments. Even after she continued to challenge the decision made by Defendants Jones and Lockley, even after she sent Defendants Jones and Maglin copies of her completed assignments, and even after she mentioned the completed assignments in her annual appraisal rebuttal document, Defendants

Jones and Maglin (the approving official) refused to modify her appraisal to more accurately reflect all her accomplishments.

87.   On January 8, 2018, Plaintiff received an email from Defendant Jones advising her that she will file a copy of her appraisal rebuttal with Plaintiff's FY'17 performance appraisal, and that she was not going to make any adjustments to her appraisal because of the rebuttal.  She told Plaintiff that if she didn't agree with the appraisal, that had the right to file a grievance in accordance with "IRM 6.771.1."

88.   Plaintiff felt Defendants Jones, Maglin and Lockley all retaliated against her when they refused to give her credit for her completed assignments even though they were completed in FY' 2017 and even though it was IRS policy that employees should receive credit for all assignments completed within their rating period.

89.   On November 6, 2017, Plaintiff sent Defendant Lockley a text message requesting administrative time to answer interrogatories on an active EEO complaint that was in the discovery process at the time and to prepare for the initiation of the 2018 EEO complaint. When Plaintiff did not hear back from him, she sent him an email the following morning requesting same. When she still I had not heard back from him, she visited him at his office where she found him.

90.   Defendant Lockley told Plaintiff he had received both her text messages and her email request and that he would make some contacts before issuing her a decision.  He initially verbally approved four hours of administrative leave for official time and told her that he would let her know if she would be approved for more time after he did some checking first.

91.   On November 7, 2017, at 11:06 a.m. Plaintiff received an email from Defendant Lockley with the subject time that read "Administrative Leave Request." The email read,

"Unfortunately, they should not have granted administrative leave in the past. EEOC is an external entity. But even if it was not, there is no entitlement of administrative time to work on filing or preparing for an EEOC case. You will have to work on filing the EEOC case on your own time. Your request is denied" before he approached her in her cubicle to inform her of his decision and before she had time to read his email.

92.   Defendant Lockley told Plaintiff that he had checked with the Labor Relations Office and that he spoke to two employees and it was they who told him that she was not entitled to the administrative time to tend to EEO/EEOC matters. Plaintiff told him he should have checked with the Equity, Diversity and Inclusion (EDI) office since the EEO program is under that office.

93.   Plaintiff challenged Defendant Lockley's decision especially since I had been approved for administrative leave in the past to tend to EEO/EEOC matters. And in so doing, I provided Mr. Lockley with the ""*Official Time in EEO Matters Fact Sheet and Frequently Asked Questions*" document that was drafted by the EDI office and the General Legal Services office. She also discussed the document with him after he confirmed the document was authentic while she was sitting in his office.

94.   Defendant Lockley promised Plaintiff that he would get confirmation and afterwards, if everything was okay, he would approve her request for administrative leave.  A short time later, he approached her as she was entering her cubicle space to summons her to his office where he told her for the second time that her request for official time had been denied citing he did not have ample time to confer.  He also told her that he sent her an email confirming his decision.

95.   At 12:40 p.m. that afternoon, Plaintiff received a follow-up to the first email sent earlier that morning, confirming his denial of her request for official time a second time when he stated,

24

"As a follow-up I'm denying your requests for official time to be used in an EEO matter, because I have not been provided sufficient time to consider the request and confer as necessary."

96.    Plaintiff believed she was entitled to official time to tend to EEO-related matters, and the regulations supported Plaintiff's belief. Plaintiff did not expect any issues when she made the request for official time especially since she was always approved for the official time from the time she first filed an EEO complaint on March 22, 2013.

97.    Plaintiff believed Defendant Lockley knew about her prior EEO filings sometime in April 2017and that he initially heard it from the DCFO, Alan Dubois when he spoke to him about Plaintiff being detailed to his office from May 14-November 11, 2017, which was soon after Plaintiff met with the DCFO to complain about Defendant Jones constant harassment. Plaintiff explained to him that she needed to get out from under Defendants Jones and Maglin's leadership because of their constant harassment.

98.    Plaintiff also believed sometime during the detail that Defendant Jones also told Defendant Lockley about her EEO filings especially since she had already told her co-worker Reese Scott as soon as he was hired into her office in April 2013.

99.    Plaintiff believes Defendant Lockley retaliated against her for opposing discrimination when he denied her request for official time to tend to EEO-related matters even though federal regulations provided for it.

100.    On November 29, 2017, Defendant Jones refused Plaintiff's request for information as to what she and Defendant Maglin wanted her to accomplish during FY' 2018 even after she composed questions for her to answer that would have given her a better understanding of what was to be accomplished.

101.   Plaintiff was given commitment assignments that were not quite clear to her so needed clarification before she would agree with them especially since she was not a part of any commitment development meetings with Defendants Jones or Maglin. After repeated attempts to get answers to her questions, in person and via email (with Defendant Jones on copy) Defendant Jones still refused to provide Plaintiff with answers/guidance to her questions. She instead reminded her that she was a GS-14 employee – a managerial official who is expected to figure things out on her own.

102.   None of Plaintiff's co-workers ever complained about not receiving guidance from management and it is for that reason Plaintiff believed she had been retaliated against when her request for guidance had been denied by management.

103.   On November 29, 2017, during Plaintiff's commitment meeting, Defendant Jones gave her a copy of her FY' 2018 commitments. Plaintiff noticed that one her commitments had a December 31, 2017, due date.

104.   Plaintiff recalled, while she was in the commitment meeting with Defendant Jones, that she had 42.75 hours of use or lose leave she needed to use by the end of pay period one (the first week in January 2018), that she had a couple of scheduled AWS days off before the end of the year, and that last day at work for the year was December 21, 2017, so she requested Defendant Jones to extend the commitment due date from December 31, 2017 to January 15, 2018, because she was sure she did not have enough time to complete the assignment before December 21, especially since she had other commitments that she would be working on as well.

105.   Defendant Jones denied Plaintiff's request for extension citing she had enough time before taking and leave to complete the assignment for which Plaintiff disagreed.

106.   None of Plaintiff's co-workers, Black or White, ever complained of not being approved an extension for an assignment for any reason which is why Plaintiff believed she had been retaliated against for opposing discrimination when Defendants Jones and Maglin denied her request to extend one of her commitments even after she provided, what she thought, a valid reason.

107.   Beginning in late 2012, after Plaintiff complained to the Pamela LaRue, (White Female) CFO about being harassed by Defendants Jones and Maglin, and ongoing, the caliber of her inventory of assignments changed. Not only did she receive a lot more assignments than her co-workers, she also received assignments that was above or below her pay grade and assignments that were not in her position description (PD).

108.   Plaintiff is fully aware of what her PD and her performance plan (PP) describe as to her duties and responsibilities since 2007, which was when she was first hired by the CFO organization. So, whenever she is assigned commitments outside her PD and PP, she questions it as in the case with one of her commitment that reads, "Work with the BFC (Manager - Government Payables Office) and the GLS (Manager- Claims - Labor & Personal Law Branch) to clean-up all old outstanding administrative nontax debts by July 31, 2018." There is nothing in Plaintiff's PD or PP that addresses cleaning up administrative tax debts, a task assigned to the Beckley Finance Center (BFC) where the tax debts are managed by the Debt Collection Unit, a unit under Defendant Maglin's leadership.

109.   Defendants Jones and Maglin also assigns Plaintiff commitments with responsibilities that are appropriate for individual that are responsible for revising, updating, or creating new IRMs or delegation orders DOs, Internal Management Documents IMDs.

110. Defendants Jones and Maglin made Plaintiff responsible for contacting and working directly with DO authors to determine if their assigned DOs need to be made either obsolete, revised, updated, or if they need to create new ones. Plaintiff is also responsible for working directly with all Financial Management Policy (FMP) staff who are authors, by January 15, 2018, requiring them to provide her with a list of any new DOs they felt needed to be developed to support current policies by January 31, 2018; and working with appropriate DO authors to create timelines and tracking mechanisms to estimate completion time for each new DO that must be developed by February 28, 2018, per my FY 2018 Commitments.

111. Per agency guidance, every author assigned to revise, update or create a new DO or any other IMDs is responsible for updating his or her assigned IMD document every two years, if appropriate.

112. The FMP office requires each author to create timelines for each of their IMDs. This requirement has been standard practice for nearly ten years. The authors all have many years of experience, way more than Plaintiff has, creating and updating their own timelines and IMDs which is why Plaintiff told Defendants Jones and Maglin that she disagrees with the commitment.

113. Plaintiff believes she has been harassed when she received work assignments that do not align with her PD in retaliation for her opposing discrimination.

114. Plaintiff believes she was disparately treated when on May 8, 2017, she was assigned three additional commitments during her May14-November 11, 2017, detailed out assignment to the IC Unit.

115. Plaintiff had not been aware she was not to receive additional commitments during her detail assignment but instead should have received tasks since she had already assigned to her

five commitments (the maximum allowed per the Human Capital Office (HCO)), until December 12, 2017, when she heard it from her co-worker Angela Coleman ("Ms. Coleman," Black Female), GS-14, who also had a detail assignment a couple of years earlier.

116.   Ms. Coleman told Plaintiff that when she took on a detail assignment in prior years, she did not receive any additional commitments, she received tasks to complete after Plaintiff shared with her that she had eight commitments assigned to her, of which three had been assigned by Defendant Lockley during her detail. Ms. Coleman also told Plaintiff that Defendant Maglin's executive assistant, Michael Webber ("Mr. Webber" - White Male) also had a detail assignment and he had not received any additional commitments. As a matter of fact, she told me, she took over Mr. Webber's assigned task when she succeeded him in her detail assignment that prior year.

117.   Plaintiff felt she was treated differently from her co-workers in retaliation for opposing discrimination when she was assigned commitments above HCO recommended five maximum commitments.

118.   On December 13, 2017, Plaintiff learned from her co-worker, Mr. MacDermid, that the regularly scheduled group meeting (that he attended on the referenced date) had been changed from Tuesdays of each week to Wednesdays (the day of the week Plaintiff was scheduled to telework) before she returned to the group from her six-month detail assignment in late November 2017.

119.   It wasn't until Plaintiff confronted Defendant Jones about what she knew about the group meetings being changed via an email she sent her addressing the change and Defendant Jones' response she gave her on December 13, 2017, when she stated, "Alfreda - I realized during the meeting this morning that I probably had not updated the staff meeting invite yet, and

just did so a few minutes ago. You should now have the staff meetings on your calendar. Also, I will check on your other question and get back to you," that she found her explanation to be contradictory especially since she had attended a group meeting a couple of weeks prior to the meeting she excluded Plaintiff from.

120. Even after realizing Plaintiff was not a part of the group meeting, Defendant Jones made no attempt to contact her while the meeting was in session, even though she or a member of her staff contacted Patricia Self (White Female), who worked in the Philadelphia, Pa office, whenever she forgot to call-into the meetings to attend via conference call.

121. Defendant Maglin also excluded Plaintiff from his recent realignment meeting that other CFO employees attended since a lot of them were being reassigned to different CFO offices. Plaintiff Millet was also affected by the realignment.

122. In or about late October 2017, Defendant Jones told Plaintiff that Defendant Maglin was having a meeting to address the upcoming CFO realignment and some of the specifics of the realignment, but she was not sure when the meeting would take place. However, on December 5, 2017, Plaintiff was told by an employee that the realignment meeting was scheduled for a Wednesday, but the employee was not sure of the date. Plaintiff went to Ms. Jones with the information to receive confirmation as far as when Defendant Maglin planned to have the meeting. Defendant Jones responded that she didn't know anything about the date and she talked to him earlier that day and that he never mentioned that the date to her and then she stated that she would check with him and get back to Plaintiff.

123. When Plaintiff had not heard back from Defendant Jones, she sent a follow-up email to her on December 13, 2017, about the meeting date. Plaintiff reminded Defendant Jones about

what the employee told her about the realignment meeting taking place on a Wednesday when she spoke with her on December 5. Defendant Jones did not respond to Plaintiff's email.

124.   On the evening of December 6, 2017, Plaintiff received a call from one of her co-workers, Michele Carr, who worked in another one of Defendant's Maglin's offices that he oversees, who told Plaintiff that Defendant Maglin had his realignment meeting that day.

125.   On or about 8:30 p.m. on December 6, Plaintiff received a meeting invite from Defendant Maglin with an invitation to the town hall meeting (to address the realignment situation) that had already taken place earlier that day. Plaintiff had planned to make herself available for the meeting so that she could learn about the realignment, especially since it affected her as well, and to take the opportunity to ask Defendant Maglin specific questions about the realignment, which did not happen. The meeting invite was only included Plaintiff's name and no mentioning of other FM employees.

126.   On December 13, 2017, Plaintiff addressed the above issue with Defendant Jones who could not figure out why she was not invited to attend the realignment meeting. She told Plaintiff that she would check with Defendant Maglin for an explanation. Plaintiff also composed and sent an email to Defendant Maglin for answers but received no response or explanation from him.

127.   Plaintiff believed she was retaliated against for opposing discrimination, when she was not notified of the group staff meetings date change and when she was not notified of when the realignment meeting was scheduled so that she could attend to received information especially since it affected her.

128.   For the past several years, Defendant Jones has been sending Plaintiff emails requesting her to choose between a time-off or monetary appraisal award even though Plaintiff has been consistently given a "Met" rating.

129.   Plaintiff knew she was not entitled to an award with the rating Defendant Jones and Maglin gave her, yet she felt humiliated each time she would receive emails requesting that she choose the type of award she preferred.

130.   It is common knowledge that for an employee to receive a time-off or monetary award, he or she must have exceeded his performance expectations and it must be reflected in the employee's annual appraisal. Even though Plaintiff should have received an "Exceed" rating or better because of her outstanding work performance, she consistently received mediocre ratings have since 2008, except for in 2010 she received an exceeds rating, chose the type of award she wanted and then told she would not receive an award at the recommendation of Defendant Maglin and her manager at the time who gave her the document to choose the type of award she preferred. Plaintiff found that to be condescending and humiliating.

131.   Plaintiff felt she had been retaliated against for opposing discrimination when she was asked to choose between a time-off award or a monetary award even though she was not entitled to one based on the rating she received.

132.   On November 6, 2017, Defendant Jones initiated contact with Plaintiff, via email, regarding a recent telework request that she had denied when she gave her a new telework request to change her in-office days on October 24, 2017, that was to become effective after she completed her detail assignment with the IC Unit.

133.   Defendant Jones denied Plaintiff's telework request on the recommendation of her then detailed-out manager, Defendant Lockley, even after she had already approved her request.

When Plaintiff asked why Defendant Jones changed her mind, she was told Defendant Lockley

told her not to approve the request after she called him and asked him if she should approve

Plaintiff's request. Defendant Jones also told Plaintiff that she denied her request based on

"business" needs and that if she had any issues with her decision that she take it up with

Defendant Lockley.

134.  Shortly thereafter, Plaintiff confronted Defendant Lockley about why he recommended

Defendant Jones not approve her change in telework schedule that would not be effective until

after her detail assignment was over, after November 11, 2017. Defendant Lockley told her that

the reason he told Ms. Jones to deny her request was because Plaintiff did not mention to him

beforehand that she wanted to change her schedule.

135.  Plaintiff's schedule at the time was to be in the office two days per week, Tuesday and

Thursday. She wanted to change her in-office days to Tuesdays and Wednesdays of each week

so she would be able to attend group meetings with other staff employees, during her next detail

assignment that was scheduled to start on November 13, 2017, immediately after her detail

assignment ended with Defendant Lockley's office which she had verbally communicated to

Defendant Jones when she initially discussed the issue about the change before she actually

submitted her official request. Plaintiff also explained to Defendant Jones that the change would

not take place until she took the second detail assignment. Defendant Jones assured Plaintiff she

would have no problem approving her request and gave her the go-ahead to submit it, but then

she denied it after Plaintiff submitted it.

136.  On Monday, November 6, 2017, Plaintiff received an email from Defendant Jones

requesting that she send her a new telework agreement before she (Defendant Jones) went on

leave the following week, if she still wanted to change her telework schedule.

137.   On that November 6 email, Defendant Jones copied the Deputy Associate Chief Financial Officer for Custodial Financial Management, the Supervisory Staff Accountant who oversees the office where I would be performing detailed out assignments, and the acting Deputy Associate Financial Administrative Financial Management, on that email and the entire email chain that took place after some back and forth conversation with Plaintiff and Defendant Jones.

138.   Plaintiff was not sure why there were senior managers and executives on the emails Defendant Jones sent to her, especially after she (Defendant Jones) had already denied her telework change request. As far as Plaintiff was concerned she already submitted a formal request and she felt she did not need not to submit another one, so she responded to Defendant Jones email wanting to know why a second request was needed.

139.   Defendant Jones responded, with the senior managers and executives on copy, with one excuse after another. In one of her email responses to Plaintiff, she stated, "The document needs to be redone with the new start date, since Kyle (Defendant Lockley) did not approve the change in telework schedule for this pay period, which is what the paperwork reflected. Consequently, we cannot use the document that was previously signed."

140.   The problem with Defendant Jones response was that the Telework Agreement request form did not have a place anywhere on the form to enter a start date which Plaintiff communicated to her only to receive another one of Defendant Jones' excuse in a subsequent email shortly thereafter that day, when she stated, "You requested to start a new telework schedule beginning on October 29, 2017" which Plaintiff did not do. Her request to change the date would not become effective until November 13.

141.   There were some additional back and forth email conversations with Defendant Jones and Plaintiff, still with senior managers and executives on copy, regarding the telework issue.

34

142.   Plaintiff stopped responding to Defendant Jones emails about the telework issue when she received November 6th email regarding the telework issue, that now included Defendants Lockley and Maglin and the other senior managers and executives.

143.   Plaintiff was angry and humiliated by Defendant Jones constant barrage of emails over the telework issue and her including other managers and executives on them for obvious reasons especially since Defendant Jones never explained the need to include them on the emails. Plaintiff felt it was a private matter and that she could have had conversations with any of them off-line about Plaintiff telework request that she made an issue.

144.   Plaintiff believes Defendant Jones retaliated, harassed, humiliated, intimated her and created a hostile environment for her, based on her race, when she included senior managers and executives on their email for her opposition to discrimination in the workplace.

145.   Plaintiff has no peace at work. She constantly believes her job is on the line whenever Defendant Jones sends her unwarranted emails directing her (not her co-workers) to do something.

146.   For example, on December 13, 2017, Plaintiff sent Defendant Jones an email stating the following:" Is it possible for us, i.e., you, Barbara, Chris, and I to have a conference call this week to discuss the current salary offset process?" Later that day, Plaintiff received a meeting invite from Defendant Jones. She scheduled a meeting on her behalf with some of the BFC staff without first making sure she was okay with her scheduling the meeting and without making sure the date was okay with her.

147.   Plaintiff was uncomfortable with what Defendant Jones had done especially since she had not begun to prepare for a meeting to discuss salary offset. When she conveyed to Defendant Jones that the date she scheduled the meeting for did not fit her schedule and that she would

35

schedule her own meeting especially since she had other priorities, Defendant Jones sent her an

email response stating, "As your manager, I am not aware of any priorities that would preclude

you from attending this meeting, and I am directing you to attend the meeting as scheduled on

Friday, December 15, 2017, at 10 a.m."

148.   Plaintiff felt her job security was threatened if she did not attend the meeting which

Defendant Jones had set up for her.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**(Race Discrimination in Violation of TITLE VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e et seq.)**

149.   Ms. Millet incorporate by reference as if fully set forth herein the allegations contained

in paragraphs 1 through 148, above.

150.   Ms. Millet race is Black. Ms. Jones became aware of her race when she met fact-to-face

in 2012.

151.   Ms. Millet engaged in protected activities including, but not limited to, filing

complaints with the IRS, and filing EEO complaints.

152. As a result of Ms. Millet's protected activities, the IRS took adverse actions against Ms.

Millet, including, but not limited to the following:

a.   Required Ms. Millet to ask for permission before working park of the day when taking

sick leave;

b.   Provided untimely approval for Ms. Millet request for sick leave;

c.   Told Ms. Millet to stop working past her tour of duty and not to speak to any co-workers

about work matters outside of work hours, unless it is cleared ahead of time;

d.     Farms out Ms. Millet's work for GS-15s, and others to review, one of whom works outside of their group;

e.     Includes co-workers on emails to Ms. Millet regarding her work assignments;

f.     Since 2013 and ongoing, management has refused to publish any of Ms. Millets IRMs;

g.     Refused to issue the Interim Guidance Ms. Millet completed;

h.     Ms. Millet was required to modify an assignment she had prepared months earlier and to present it to her second-level supervisor one-on-one, even though the work and presentation was unnecessary;

i.     Ms. Millet was required to make a presentation that was unnecessary and was outside of her position description;

j.     Ms. Millet was forced to attend a conference call meeting in her second-level supervisors office, sitting in front of him, instead of being allowed to dial in from her desk like her co-workers;

k.     Ms. Millet received an unfair performance rating that did not give her credit for many completed assignments and contained inaccurate, negative, and frivolous comments which her managers refused to modify after receiving Ms. Millet's rebuttal; and

l.     Ms. Millet co-worker called her to discuss work and was hostile, abrasive and loud, stating that she was trying to help Ms. Millet because her first and second-level managers were trying to find something on her so that they could fire her. When Ms. Millet asked the referenced managers, her second-level manager told her that he was not trying to first her at this time while the first-level manager provided no response.

## SECOND CAUSE OF ACTION

### (Age Discrimination in Violation of the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. § 621 et seq.)

37

153. Ms. Millet herby incorporates all preceding paragraphs of this Complaint as if fully set forth herein

154. In violation of the ADEA, the IRS discriminated against Ms. Millet when she made charges of employment discrimination based on her race.

155. Ms. Millet was born in 1957. Ms. Jones became aware of Ms. Millet's age in 2013 when Ms. Jones reviewed Ms. Millet's personnel records. Mr. Maglin became aware of Ms. Millet's age in October 2007 when he reviewed her personnel records

156. In violation of Title VII, the IRS discriminated against Ms. Millet because she made charges of employment discrimination. Ms. Millet engaged in protected activities including, but not limited to, filing complaints with the IRS.

157. As a result of Ms. Millet's protected activities, the IRS took adverse actions against Ms. Millet, including, but not limited to the following:

a. Required Ms. Millet to ask for permission before working park of the day when taking sick leave;

b. Provided untimely approval for Ms. Millet request for sick leave;

c. Told Ms. Millet to stop working past her tour of duty and not to speak to any co-workers about work matters outside of work hours, unless it is cleared ahead of time;

d. Farms out Ms. Millet's work for GS-15s, and others to review, one of whom works outside of their group;

e. Includes co-workers on emails to Ms. Millet regarding her work assignments;

f. Since 2013 and ongoing, management has refused to publish any of Ms. Millets IRMs;

g. Refused to issue the Interim Guidance Ms. Millet completed;

h.   Ms. Millet was required to modify an assignment she had prepared months earlier and to present it to her second-level supervisor one-on-one, even though the work and presentation was unnecessary;

i.   Ms. Millet was required to make a presentation that was unnecessary and was outside of her position description;

j.   Ms. Millet was forced to attend a conference call meeting in her second-level supervisors office, sitting in front of him, instead of being allowed to dial in from her desk like her co-workers;

k.   Ms. Millet received an unfair performance rating that did not give her credit for many completed assignments and contained inaccurate, negative, and frivolous comments which her managers refused to modify after receiving Ms. Millet's rebuttal; and

l.   Ms. Millet co-worker called her to discuss work and was hostile, abrasive and loud, stating that she was trying to help Ms. Millet because her first and second-level managers were trying to find something on her so that they could fire her. When Ms. Millet asked the referenced managers, her second-level manager told her that he was not trying to first her at this time while the first-level manager provided no response.

### THIRD CAUSE OF ACTION
### (Retaliation in Violation of TITLE VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e et seq.)

158.   Ms. Millet herby incorporates all preceding paragraphs of this Complaint as if fully set forth herein.

159.   Ms. Millet filed the following prior discrimination proceedings; TD number IRS-13-0342-F, filed in March 2013 Gina Jones and William Maglin; IRS-14-0469-F, filed in May 2014 against Ms. Jones, Mr. Maglin, Gregory Kane, April Winfree-Daniels, Hattie Logan, Anita Davis

and Louis Malfait; and IRS-16-0139-F, filed in January 2016 against Ms. Jones, Mr. Maglin and Mr. Kane.

160.   Ms. Jones first became aware of Ms. Millet's filing in April 2013 and Mr. Maglin first became of Ms. Millet's filing in April 2013. Both Ms. Jones and Mr. Maglin were accused of discriminating against Ms. Millet based on her age and race and retaliating against her because of the EEO complaints she filed.

161.   In violation of Title VII, the IRS discriminated against Ms. Millet because she made charges of employment discrimination. Ms. Millet engaged in protected activities including, but not limited to, filing complaints with the IRS.

162.   As a result of Ms. Millet's protected activities, the IRS took adverse actions against Ms. Millet, including, but not limited to the following:

a.   Reassignment to significantly different responsibilities than those she had previously been assigned to perform;

b.   Exclusion from meetings which fell within the responsibilities outlined in the position description for her role;

c.   Denial of official time to tend to EEO-related matters when she made a request for it;

d.   She was required to ask for permission before working part of the day when taking sick leave;

e.   Provided Ms. Millet with untimely sick leave approval;

f.   Imposed a requirement that Ms. Millet stop working past her tour of duty and not to speak with any co-workers about work matters outside of work hours, unless it is cleared ahead of time;

g.   Asked to perform additional duties and assigned new commitments during a detail

h.    Provided Ms. Millet with annual appraisals that were unwarranted, incomplete, and not modified after her rebuttal;

i.    Refusal to align Ms. Millet's commitments and responsibilities with her job description;

j.    Denied Ms. Millet's request for change in her telework schedule;

k.    Denied Ms. Millet's request for guidance;

l.    Denied Ms. Millet's request for an extension on one of her assignments;

m.    Requested Ms. Millet to choose between a time-off award or a monetary award when she was not entitled to either; and

n.    Copied several levels of supervisors, on emails Ms. Millet received, including some emails directing her to perform specific actions, most recently on December 14, 2017.

163.    As a result of the IRS discriminatory and retaliatory actions, Ms. Millet has suffered humiliation, embarrassment, psychological and emotional harm, severe emotional and psychological distress and damage to her career.

**PRAYER FOR RELIEF**

WHEREFORE, Ms. Millet hereby demands and prays for the following:

1.    Declare that the practices described in this Complaint exist at the IRS and that they are unlawful;

2.    For an order enjoining Defendants from engaging in the unlawful acts complained on herein

and successors from engaging in the discriminatory employment practices complained of herein;

3.    Award Plaintiff compensatory damages enough to redress the harms that she has suffered;

4.    Award Plaintiff actual damages for expenses incurred for medical services including the expense of doctor visits, including scans and x-rays, the cost of medication to treat her medical

issues that she endured that was directly connected to her being discriminated against, and the cost of therapy sessions (for the harm caused).

5.   For reasonable attorney's fees (that was incurred before this filing) and costs of suit pursuant to 42 U.S.C. § 2000e-5(k) and other laws, and

6.   For such other and further relief as this Court deems just and proper.


Dated: June 25, 2019

Respectfully submitted,


By: _Alfreda D. Millet_

Alfreda D. Millet, *Pro se Litigant*


## DEMAND FOR A TRIAL BY JURY

Plaintiff demand a jury trial on all causes of action and claims to which she has a right to a jury trial.

Dated:  June 25, 2019

Respectfully submitted,


_Alfreda D. Millet_

Alfreda D. Millet, *Pro se Litigant*